| | |
|---|---|
| DENIS I. VILCHEZ,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>　　　　　Defendant. | <u>**COMPLAINT**</u><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Denis I. Vilchez ("Plaintiff" or "Mr. Vilchez") brings this action for violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*; Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.§ 12101, *et seq*.; and wrongful discharge in violation of public policy under N.C. Gen. Stat. § 143-422.1, and alleges the following:

<u>**PARTIES**</u>

1.　　　Plaintiff is a resident of Charlotte, North Carolina.

2.　　　Wells Fargo Bank, N.A., ("Defendant" or "Wells Fargo") is a South Dakota national association, registered to do business in North Carolina, with a corporate office located at 300 South Brevard Street, Charlotte, North Carolina 28202.  Defendant employed Mr. Vilchez during the events giving rise to this action.

1

## JURISDICTION AND VENUE

3.     This Court has original jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims under FMLA and ADA because the claims arise under the laws of the United States.

4.     Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 for the pendent state claims because they arise out of the same nucleus of operative facts as the federal claims. All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness and convenience for the parties.

5.     This Court has personal jurisdiction over Defendant because Defendant has a place of business located in Charlotte, North Carolina, which is located within this judicial district.

6.     At all relevant times, Defendant was, and is, an "employer" within the definition of FMLA, 29 U.S.C. § 2611(4)(A) on the basis that it employs more than 50 employees.

7.     At all relevant times, Plaintiff was an "eligible employee" within the definition of FMLA, 29 U.S.C. § 2611(2)(A), on the basis that Defendant employed Plaintiff for at least 12 months, and Plaintiff performed at least 1,250 hours of service for Defendant.

8.     At all relevant times, Defendant was an "employer" within the definition of ADA, 42 U.S.C. § 12101, *et seq*. (specifically, 42 U.S.C. § 12111) on the basis that it employs more than 15 employees.

9.     At all relevant times, Plaintiff was an "employee" of Defendant within the definition of ADA, 42 U.S.C. § 12111.

10.     At all times relevant to this action, Defendant possessed and exercised the power and authority to direct, control and supervise the work performed by Plaintiff.

2

11. Venue is also proper in this District under 28 U.S.C. § 1391 because Plaintiff was hired to work in this district and Defendant conducts business in this district.

**ADMINISTRATIVE EXHAUSTION**

12. Plaintiff satisfied his obligation to exhaust his administrative remedies by timely filing a Charge of Discrimination on January 28, 2026 against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and retaliation.

13. The EEOC issued a Notice of Right to Sue on May 27, 2026. Plaintiff timely brings this action within ninety (90) days of his receipt thereof.

**GENERAL ALLEGATIONS**

14. Plaintiff was hired by Defendant in 2019 as a Senior External Financial Reporting Consultant working in the finance department within the controllers group at Wells Fargo.

15. In April 2020, Plaintiff was transitioned to the position Senior Lead Analytic Consultant on the data validations team within Wells Fargo Auto.

16. In 2023, Plaintiff's title changed to Senior Lead Business Intelligence Consultant wherein he served as the production team's automation lead and senior analyst.

17. From 2020 through 2023, Plaintiff consistently received performance evaluations from his manager, Jeff Hasmann ("Hasmann") with ratings of "Meets" and "Exceeds."

18. In 2023, Plaintiff's eight month-old daughter required a liver transplant.

19. On or about March 9, 2023, Plaintiff made a request to Hasmann to take FMLA leave to tend to his daughter as she underwent the liver transplant and recovered, as she required care.

3

20. In response to Plaintiff's request for FMLA leave, Hasmann said he needed Plaintiff to work continuously on automation and production routines as well as train the Wells Fargo India team.

21. Instead of approving Plaintiff's FMLA leave, Hasmann offered Plaintiff informal flexibility to tend to medical care for his daughter while he worked remotely. Plaintiff therefore had to work during the time his daughter underwent the liver transplant and post-transplant recovery. This included Plaintiff working from his daughter's hospital bedside as she recovered.

22. Plaintiff reluctantly took Hasmann's offer to work remotely instead of taking FMLA leave to avoid jeopardizing the management track plan Hasmann had offered him since December 2021.

23. Throughout 2024, Hasmann again discouraged Plaintiff from filing a FMLA leave request and instead offered Plaintiff informal flexibility as he did in 2023 immediately after Plaintiff's daughter had liver transplant surgery.

24. On or about August 28, 2024, Plaintiff and Hasmann had a conversation wherein Hasmann stated that his manager, Katherine Carter ("Carter"), was aware of emails between Plaintiff and Sarah Jeanes ("Jeanes") wherein Plaintiff pushed back on her SLA at Hasmann's direction. Hasmann said he scheduled the call to tell Plaintiff that Carter had asked him to deliver a message: "If today was performance review day which would take place in October Sarah would be sitting at the table providing input on performance and Denis would get a does not meet in performance because of that note." Hasmann was unwilling to take responsibility for his lack of calibration with his peer, and he pointed fault at Plaintiff.

25. On or about September 4, 2024, Plaintiff had a conversation with Hasmann during which Plaintiff communicated that his daughter had additional complications due to her liver

4

transplant and Plaintiff was concerned this would require additional hospital care for her. Hasmann told Plaintiff to take care of his daughter, but he asked Plaintiff to work from the hospital like he did during his daughter's transplant and recovery in 2023.

26. Plaintiff's daughter was admitted to the hospital three times in September 2024, and Plaintiff worked long hours at her bedside to meet Hasmann's expectations instead of taking FMLA leave.

27. On or about October 23, 2024, Plaintiff requested intermittent FMLA leave through Defendant's Human Resources Department in order for him to take care of his daughter's medical conditions as he faced growing resistance from Hasmann. Specifically, Plaintiff received less flexibility from Hasmann to tend to his daughter's medical needs.

28. On or about November 13, 2024, Plaintiff met with Hasmann and mentioned he would be taking FMLA leave on November 14th and 15th. Hasmann stated that the FY14Q had an audit issue that needed to be closed much sooner than the deadline in March 2025 because Matt Schell, the Control Management Executive, was pushing to close it as soon as possible. Therefore, Hasmann needed Plaintiff to attend two work calls scheduled at the same time he had scheduled FMLA leave. Hasmann most certainly gave the impression that Plaintiff's attendance was mandatory.

29. On or about November 14, 2024, Plaintiff attended a work call due to the pressure from Hasmann. When Plaintiff offered a suggestion regarding the FY14Q, Hasmann said it was "stupid" in front of all participants on the call because it would create more issues if the company did not use a third-party vendor to check VINs.

30. That afternoon, Plaintiff sent an email to Hasmann expressing his concern over his workload and tight deadlines he was given to complete assignments. Plaintiff continued to

receive unreasonable assignments when he was out on FMLA leave. For example, Plaintiff was put on the spot to deliver validations that were accidentally assigned to Hasmann, where the due date had already passed.

31. On or about November 15, 2024, Plaintiff participated in another FY14Q call despite being on FMLA leave due to pressure from Hasmann.

32. On or about November 22, 2024, Plaintiff had a conversation with Hasmann during which Plaintiff noticed Hasmann had been directing the conversation to casual topics and not involving Plaintiff in the FY14Q project after requiring him to attend the related calls during his FMLA leave.

33. On or about December 2, 2024, Hasmann told Plaintiff that Carter received complaints from Jeanes that Agile tickets were not completed before the due date. Plaintiff told Hasmann those tickets were assigned during the time he was on FMLA leave. Hasmann informed Plaintiff that Carter directed him to write a corrective action for Plaintiff because of the complaints.

34. Hasmann also stated he expected Plaintiff to work three days per week despite his intermittent FMLA leave. Plaintiff responded that the number of days he worked weekly would depend on his daughter's medical needs, but his intent was to only use intermittent FMLA leave when his daughter needed his support.

35. Plaintiff also informed Hasmann he wanted to appeal the corrective action Carter directed to be filed against him. Hasmann told Plaintiff it was not necessary to involve Human Resources. That same day Plaintiff requested a Human Resources employee consultation concerning the corrective action plan.

36. On or about December 12, 2024, Jeanes assigned another complex ticket to

6

Plaintiff and set him up for failure by not providing an appropriate timeline to perform the work. This was despite Plaintiff being scheduled for paid time off and FMLA leave, and he could not work on the assignment unless he worked extended hours during the week and weekend, and into his leave time. Plaintiff explained to Jeanes he was at his maximum capacity for work assignments at that time due to his scheduled leave.

37.     On or about January 15, 2025, Hasmann instructed the team not to work on peer reviews. However, on or about January 17, 2025, Jeanes assigned peer reviews to Plaintiff. This was contradictory to Hasmann's prior directive.

38.     On or about January 21, 2025, when Plaintiff asked Hasmann about this contradictory instruction, Hasmann doubled down and told Plaintiff to work on peer reviews. Plaintiff is unaware of other colleagues who were given instructions to work on peer reviews despite Hasmann's prior instruction.

39.     On or about January 22, 2025, Plaintiff received his 2024 performance evaluation from Hasmann which contained an overall performance rating of "Inconsistently Meets" based on Plaintiff's performance during the last four months of 2024.  This was decided by a committee led by Carter and her direct reports, including Tungmui Lau Merrill ("Merrill") and Jeanes.  Plaintiff informed Hasmann he did not agree with this rating.  Plaintiff also noticed that the statements on his performance evaluation were almost identical to those on the corrective action Carter directed Hasmann to file against Plaintiff after he took FMLA leave.

40.     On or about January 28, 2025, Hasmann stated he was expecting approximately 100 reports to be transitioned from the BIX team to Plaintiff's production team, but there were challenges setting up for this.  Plaintiff offered to help and referenced working on something similar in the past.  However, Hasmann declined Plaintiff's assistance and did not seem to want

7

to offer Plaintiff work where he could make a meaningful impact on the team. Hasmann made a reference to Plaintiff doing a lot of work on a similar project but avoided Plaintiff's participation.

41. That same day, during a team meeting, Hasmann asked two team members to become familiar with CRDM backup and production routines to take over Plaintiff's responsibilities.

42. On or about January 30, 2025, Plaintiff and Hasmann had a one-on-one meeting during which Hasmann told Plaintiff his year-end compensation for 2024 was $16,000. This was $12,000 less than Plaintiff received the prior year. Hasmann explained this decrease was due to Plaintiff's "Inconsistently Meets" performance rating. Plaintiff expressed he did not agree with the rating, and he felt it was retaliation for him taking FMLA leave.

43. Hasmann told Plaintiff that Jeanes was not the only member of management who was unhappy with Plaintiff, and he stated Merrill was also displeased. Hasmann admitted that none of this was due to any fault by Plaintiff. Hasmann also said that he tried to fight for Plaintiff, but Carter did not like to hear about any issues on the team, and she made the decision to lower Plaintiff's rating to optimally lower his compensation.

44. On or about February 13, 2025, Plaintiff had a conversation with Hasmann during which Hasmann asked Plaintiff to work on BTNM-314 and BTNM-325 to satisfy CRDM enhancement even though Plaintiff had scheduled FMLA leave the following week. Plaintiff explained that he could work on BTNM-314 that day, the following day, and over the weekend, but the following week he had scheduled FMLA leave Wednesday through Friday. Hasmann pressured Plaintiff, saying he needed this done.

45. On or about March 5, 2025, Plaintiff discovered that Carter, Merrill, and Jeanes excluded him from working on BTNM-327. This resulted in Plaintiff being removed from a

8

visible and key project without informing him that he did not need to proceed with access or research as previously planned.

46. On or about June 3, 2025, Plaintiff informed Hasmann he would need to take FMLA leave as his daughter was admitted to the hospital. Plaintiff's deadlines were shortened by Jeanes immediately thereafter. Merrill was not empathetic towards Plaintiff's situation, and she stated that she did not understand the disconnect with Plaintiff and that everyone else seemed to understand their responsibilities without problems. This was expressed by Merrill on an email chain that included Plaintiff, Jeanes, Chris Redden ("Redden"), Hasmann, and Carter.

47. On or about July 21, 2025, Plaintiff received his mid-year performance evaluation from Hasmann who stated Plaintiff was very technical, did a great job identifying risks, and had a high-quality work product. However, Plaintiff still received an "Inconsistently Meets" rating on his evaluation. Plaintiff expressed his disagreement with the rating. Hasmann stated the rating was a directive from Carter, and he believed it was unfair.

48. During this meeting, Plaintiff reminded Hasmann that he worked from his daughter's hospital bedside while on FMLA leave. Plaintiff explained he had been working hard for the team and was concerned about how Jeanes, Carter, and Merrill had been manipulating his performance through unreasonable deadlines while Hasmann was a bystander.

49. Later that day, Plaintiff sent a follow-up email to Hasmann stating he felt his performance rating was unfair and retaliatory due to him taking FMLA leave. Plaintiff also asked Hasmann if there was policy or goal that outlined the number of peer reviews to validation ratio expected to receive a "Meets" rating because Plaintiff had never seen it. Plaintiff had also been instructed to work on peer reviews as Jeanes was assigning that work to him. Plaintiff also asked Hasmann why he referenced his FMLA leave in his performance review.

9

50.  Hasmann responded to Plaintiff's email and did not deny Plaintiff's allegation of retaliation. Hasmann stated there was no policy outlining expectations of a validation to peer review, but it was "common sense." He also denied instructing Plaintiff to work on peer reviews and told Plaintiff to check with other team members to see if they remembered Hasmann instructing the team not to work on peer reviews.

51.  On or about July 22, 2025, Plaintiff filed a complaint with Human Resources about the retaliation he faced, and he disputed his mid-year performance rating.

52.  On or about August 15, 2025, Plaintiff noticed Hasmann distancing himself from Plaintiff.  During a meeting that day, Plaintiff requested assistance from Hasmann with a request for accommodation as Plaintiff was suffering from anxiety and depression which made it difficult for Plaintiff to concentrate and focus.  Plaintiff specifically asked if he could be afforded extra time to complete JIRA tickets as an accommodation for his disability.

53.  Hasmann responded to Plaintiff's accommodation request by stating the only way he could afford any flexibility for Plaintiff was if he were to become a part-time employee as another associate had previously done prior to retiring.  Hasmann's response was short and discouraging as this would negatively impact Plaintiff's pay and benefits, which he could not afford.  Plaintiff opted not to become a part-time employee as a result.

54.  On or about August 26, 2025, Hasmann announced that three associates under him, Lucas Lu, Steven Mills, and David Horne, were being moved to work under Merrill because of their work aligning closer to projects being managed by that team.  Additionally, Plaintiff was informed he was removed from special projects Hasmann had him work on related to FY14Q.  This was despite Plaintiff having a close affinity with the projects and more experience than anyone else on the team.

55. On or about September 24, 2025, Plaintiff discovered that Hasmann entered a check-in on the workday Human Resources system stating he met with Plaintiff on April 10, 2025 to discuss a deviation from procedures concerning validation methodology. However, this claim was false as such meeting never took place. Plaintiff never met with Hasmann that day nor did Hasmann allow Plaintiff to defend his work that day. Instead, that was when Plaintiff was out on FMLA leave. Plaintiff therefore contacted Hasmann to contest this entry.

56. On September 30, 2025, the day before Hasmann retired, he sent Plaintiff a response email stating Plaintiff had one validation that year that was not fully independently written. Hasmann also stated Plaintiff did not need to worry about the April 10, 2025 entry as this was allegedly done solely to satisfy Audit.

57. Plaintiff responded to Hasmann stating he never discussed the validation with Plaintiff. He also noted that Hasmann had been avoiding one-on-one meetings with Plaintiff by either not showing or canceling them. Plaintiff also stated that the feedback Hasmann gave Plaintiff, such as "All is great," "You are doing great," "Your work is high quality and you are productive," did not match the "Inconsistently Meets" rating he received on the mid-year evaluation, which Hasmann blamed on Carter, Jeanes, and Merrill.

58. Plaintiff forwarded this email exchange with Hasmann to Human Resources as a follow-up to his previously filed retaliation complaint.

59. On or about October 8, 2025, Plaintiff contacted Human Resources to request accommodation for his depression and anxiety. Plaintiff was informed he needed to request medical leave first, and if his leave request was not approved, only then could he request accommodation. During this same communication, Plaintiff inquired if this request would impact his ability to use paternity leave.

11

60. On or about October 9, 2025, Plaintiff submitted a self-assessment for 2025 wherein Plaintiff gave himself an "Exceeds" rating. On the self-assessment, Plaintiff listed his many accomplishments during 2025, which included supporting the shared data services team by providing production continuity code validation support that exceeded expectations, dedicating long hours on weekends and holidays to provide support on Shift and Alfa testing, providing key support to CRDM 14YQ testing and enhancement planning, participating in SHIFT and ALFA project validations including key ADA related instruments, providing uninterrupted support during a family hardship, and completing complex expedited validations on a short timeline when other team members were not able to complete their assignments.

61. On his self-assessment, Plaintiff noted that Hasmann informed him that Hasmann was forced by Carter to give Plaintiff a low rating on his mid-year evaluation. Plaintiff further noted that Hasmann stated the rating was unfair, but Carter and Merrill did not want Plaintiff on their team after he filed an FMLA retaliation complaint. Per Hasmann, the validation versus peer review ratio was used as a pretext to give Plaintiff a lower rating. Plaintiff stated his rating should have been "Meets" at minimum.

62. Plaintiff also noted that Hasmann admitted Merrill and the rest of the management team documented false conversations with Plaintiff to satisfy Audit. Plaintiff stated the feedback documented on April 10, 2025 never took place.

63. On or about October 14, 2025, Plaintiff's team had a routine Agile group meeting scheduled and led by Redden. At the end of the meeting, Redden asked Sarath Tangudu ("Tangudu"), Mary Phythian ("Phythian"), and Jeanes to stay on the line after all others left the call.

64. On or about October 20, 2025, Plaintiff was informed by Human Resources investigator Katherine Arnsbarger that her investigation had concluded and Plaintiff's complaint of FMLA retaliation was unsubstantiated.

65. On or about October 21, 2025, Redden mentioned to Plaintiff's team that Phythian and Tangudu would no longer attend Agile group meetings as they had been transitioned to Merrill's team.

66. On or about November 3, 2025, Senior Group Director Vivek Datta ("Datta") scheduled a 15-minute meeting for the following day at 9:15 am. Plaintiff responded via email asking if he needed to prepare any materials for the meeting because Plaintiff had leave time scheduled for that day, but Datta did not respond.

67. On or about November 4, 2025, Plaintiff joined the meeting with Datta that morning. Datta stated that the team was going through efficiencies and as part of that process Plaintiff's position had been eliminated. Datta told Plaintiff that he should focus on his next career steps during the following 60-day Notice Period. If Plaintiff did not continue to work during that time, he would be paid severance.

68. Plaintiff asked Datta if he was eligible to internally apply for open positions at Wells Fargo during the Notice Period. Datta said Plaintiff could explore open roles. Plaintiff informed Datta that even though he had requested FMLA leave to take care of his daughter, he had been working hard to contribute to the team.

69. Additionally, Plaintiff asked Datta how Wells Fargo determined what positions were eliminated. Datta responded by saying that there were a "bunch of factors," but performance had not been one of them. Datta insisted the position elimination was due to efficiencies.

70. Within minutes after Plaintiff's meeting with Datta ended, he no longer had access to his Wells Fargo email or internet. Prior to being disconnected, Datta had already sent an email to Plaintiff's team announcing the reorganization due to Plaintiff's position elimination.

71. Plaintiff then called Human Resources who stated he was on paid leave until January 2, 2026, unless there was a change in his employment status prior to that date. Plaintiff was told he could look for internal career opportunities within 48 hours.

72. In order for Plaintiff to receive severance benefits for another three months after the Notice Period, he was required to sign a severance agreement within 45 days. Plaintiff declined to sign the agreement as he did not agree with the terms.

73. That same day as Plaintiff being notified of his termination, he noticed that his self-assessment that documented the retaliation he endured for taking FMLA leave had been removed and replaced with his mid-year performance evaluation.

74. Immediately following Plaintiff's request for accommodation, Plaintiff faced discrimination and retaliation from Defendant wherein his employment was terminated within one month after making such request.

75. Defendant knew Plaintiff was entitled to receive FMLA leave and had interfered with his ability to do so.

76. Defendant failed to provide Plaintiff with notice of his eligibility and rights as required by the FMLA, including the individualized notice of his job protection rights.

77. Defendant interfered with Plaintiff's FMLA rights by failing to provide him with notice that he was entitled to said FMLA leave based on the qualifying event of which Defendant was aware.

14

78.     At all times, Plaintiff clearly communicated to Defendant that he wanted to return to work after his FMLA leave ended.

79.     Plaintiff therefore believes and avers that Defendant discriminated and retaliated against him due to his disability, and for requesting and taking FMLA leave.

**COUNT I**
**Violation of FMLA – Interference**

80.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

81.     Defendant was aware that Plaintiff had suffered a qualifying event under FMLA.

82.     Defendant prevented Plaintiff from taking his lawfully permitted FMLA leave under 29 U.S.C. § 2612(a)(1)(C) in order to care for his daughter who needed a liver transplant and required medical care and treatments thereafter.

83.     Defendant retaliated against Plaintiff for taking his lawfully permitted FMLA leave under 29 U.S.C. § 2612(a)(1)(C) in order to care for his daughter who needed a liver transplant and required medical care and treatments thereafter.

84.     Defendant denied, interfered with, and restrained Plaintiff from the lawful exercise of his substantive rights provided under the FMLA including, but not limited to, failing to provide the required individual FMLA notices to him and thereby preventing him from making informed decisions about his leave.

85.     Plaintiff was automatically prejudiced by the lack of required individualized notice. He was further prejudiced because he continuously faced retaliation after requesting and taking FMLA leave, and his job was not held open for him as required by the FMLA when he was ultimately terminated under the pretext that his position was eliminated. Plaintiff has thus suffered damages because of Defendant's unlawful conduct.

15

86. Defendant's violation of the FMLA, 29 U.S.C. § 2615(a)(1), by interfering with Plaintiff's lawful exercise of his rights under FMLA, was willful and/or lacking good faith.

## COUNT II
### Violation of FMLA – Retaliation

87. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

88. Plaintiff engaged in protected activity by requesting, using, and opposing interference with FMLA leave to care for his daughter's serious health condition.

89. Defendant knew of Plaintiff's protected FMLA activity.

90. After Plaintiff requested and used FMLA leave, Defendant subjected Plaintiff to adverse employment actions, including but not limited to negative performance ratings, reduced compensation, removal from meaningful projects, unreasonable deadlines, corrective-action threats or documentation, exclusion from work opportunities, and termination.

91. The temporal proximity, shifting explanations, reliance on work assignments affected by FMLA leave, and management statements described above support a reasonable inference that Plaintiff's protected FMLA activity was a motivating factor in Defendant's adverse actions.

92. Defendant's retaliation violated 29 U.S.C. § 2615(a)(2) and caused Plaintiff damages, including lost wages, lost benefits, liquidated damages, and other relief available under the FMLA.

## COUNT III
### Violation of ADA - Failure to Accommodate

93. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

94. At all relevant times after Plaintiff notified Defendant of his anxiety and depression and requested accommodation, Plaintiff was a qualified individual with an actual or perceived disability within the meaning of the ADA.

95. Plaintiff could perform the essential functions of his job with reasonable accommodation, including additional time and flexibility to complete work assignments and JIRA tickets.

96. Plaintiff requested accommodation on or about August 15, 2025, and again on or about October 8, 2025.

97. Defendant failed to reasonably accommodate Plaintiff in violation of 42 U.S.C. § 12112(b)(5)(A), including by refusing to provide additional time or flexibility and instead suggesting that Plaintiff become a part-time employee, which would have negatively affected his pay and benefits.

98. Defendant further failed to engage in the interactive process in good faith as required by 29 C.F.R. § 1630.2(o)(3).

99. Defendant's conduct caused Plaintiff damages, including lost wages, lost benefits, emotional distress, mental anguish, and other compensable losses.

### COUNT IV
### Violation of ADA - Disability Discrimination

100. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

101. Plaintiff was a qualified individual with an actual or perceived disability, including anxiety and depression, within the meaning of the ADA.

102. Defendant knew or perceived that Plaintiff had a disability after Plaintiff requested assistance and accommodation for anxiety and depression.

17

103.    Plaintiff was performing his job at a level that met Defendant's legitimate expectations, including by producing high-quality work, identifying risks, and supporting key projects.

104.    Defendant discriminated against Plaintiff because of his actual or perceived disability by, among other things, denying accommodation, failing to provide meaningful work opportunities, relying on pretextual performance criticisms, and terminating his employment.

105.    Defendant's stated reasons for its actions were pretextual and occurred under circumstances giving rise to a reasonable inference of disability discrimination.

106.    Plaintiff has been damaged by Defendant's violation of the ADA and is entitled to all relief permitted by law, including attorneys' fees and costs under 42 U.S.C. § 12205 and equitable relief under 42 U.S.C. § 12117(a).

## COUNT V
### Violation of ADA – Retaliation

107.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

108.    Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodation for anxiety and depression and by opposing disability-related discrimination and retaliation.

109.    Defendant knew of Plaintiff's protected activity.

110.    Shortly after Plaintiff requested accommodation, Defendant terminated Plaintiff's employment and took other adverse actions described above.

111.    The close temporal proximity between Plaintiff's accommodation requests and termination, together with the facts alleged above, supports a reasonable inference that Defendant retaliated against Plaintiff for protected ADA activity.

18

112. Defendant's retaliation violated the ADA and caused Plaintiff damages, including lost wages, lost benefits, emotional distress, mental anguish, attorneys' fees, costs, and other relief permitted by law.

## COUNT VI
### Violation of ADA – Associational Disability Discrimination

113. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

114. Plaintiff was qualified for his position and was able to perform the essential functions of his job.

115. Plaintiff had a known relationship and association with his daughter, who had a serious medical condition and disability, including complications related to her liver transplant and ongoing medical care.

116. Defendant knew of Plaintiff's daughter's disability and Plaintiff's need to care for her.

117. Defendant discriminated against Plaintiff because of his known relationship and association with his disabled daughter by, among other things, pressuring him to work while caring for her, relying on absences and work affected by her medical needs as a basis for adverse action, lowering his performance ratings, reducing his compensation, removing him from projects, and terminating his employment.

118. Defendant's conduct violated 42 U.S.C. § 12112(b)(4).

119. Plaintiff suffered damages as a result.

## COUNT VII
### Wrongful Discharge in Violation of Public Policy

120. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

19

121.  Defendant violated the public policy of North Carolina as set forth in N.C. Gen. Stat. § 143-422.1, et seq. by terminating Plaintiff because of an actual or perceived disability, because Plaintiff engaged in the protected activity of requesting an accommodation for his disability, and/or because Plaintiff filed a retaliation complaint with Defendant's Human Resources.

122.  Defendant violated the public policy of North Carolina by terminating Plaintiff because of his actual or perceived disability and because he requested reasonable accommodation for that disability.

123.  Defendant violated public policy by terminating Plaintiff after he exercised his rights and in good faith opposed what he viewed as injurious conduct as set forth in the paragraphs above.

124.  As an actual, proximate, and foreseeable consequence of Defendant's conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

125.  Defendant's actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights.

126.  As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial.

127.  Defendant's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief:

1.  An Order awarding Plaintiff damages for Defendant's violation of the FMLA,

including backpay, lost wages, employment benefits, liquidated damages and any other compensation denied or lost because of Defendant's violation of the FMLA;

2. An Order awarding Plaintiff damages for Defendant's violation of the ADA, including backpay, lost wages, employment benefits, and any other compensation denied or lost because of Defendant's violation of the ADA;

3. An Order awarding Plaintiff compensatory damages for emotional distress, pain and suffering, inconvenience, and/or mental anguish in an amount to be proven at trial;

4. An Order awarding Plaintiff punitive damages under N.C. Gen. Stat. § 1D-115 in an amount to be proven at trial;

5. An Order awarding Plaintiff the costs of this action;

6. An Order awarding Plaintiff reasonable attorneys' fees;

7. An Order awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law; and

8. An Order granting any other necessary or appropriate relief to which Plaintiff is entitled under the law.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury.

> _/s/ L. Michelle Gessner_
> L. Michelle Gessner, NCSB#26590
> GESSNERLAW, PLLC
> 6146 Rea Road STE B7, Box #77126
> Charlotte, NC 28277
> Tel: (704) 234-7442; Fax: (980) 206-0286
> Email: michelle@mgessnerlaw.com
>
> _Attorney for Plaintiff_

Case 3:26-cv-00415-MOC-WCM     Document 1     Filed 05/27/26     Page 21 of 21